Jake Freeman *pro se*
186 Summit Ave
Summit, NJ 07901
(541) 249-5710
jakefreemanecf@gmail.com

United States District Court

District of New Jersey

| | |
|---|---|
| JAKE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>MUNICIPALITY OF PRINCETON<br><br>Defendant. | Case No. 3:26-cv-02140-RK-RLS<br><br>**First Amended Complaint for Injunctive Relief and Monetary Damages for Federal Civil Rights Violations and Demand for Jury Trial** |

## INTRODUCTION

1. This action challenges the Municipality of Princeton's ("Princeton") warrantless practice of physically marking vehicle tires with chalk to gather information about vehicle movement for parking enforcement purposes, in violation of the Fourth Amendment to the United States Constitution.
2. Princeton has violated Freeman's civil rights and abused the limitations put on the power of the government (under the Constitution) by engaging in the wide-ranging practice of chalking car tires.
3. Without a warrant or an applicable exception to the Fourth Amendment, Princeton has engaged in the practice of emplacing chalk on the tires of Freeman's vehicle to surveil Freeman and obtain information about whether Freeman's vehicle had moved since the emplacement of the chalk.

## PARTIES

4. Plaintiff JAKE FREEMAN is a student at Princeton University who has received parking tickets because of the use of marking "chalk" placed on his vehicles by a parking enforcement officer with the Municipality of Princeton without permission or authority, or the existence of any exigent circumstances. Freeman is a resident of New Jersey.

5. Defendant MUNICIPALITY OF PRINCETON ("Princeton") is a municipal corporation formed under the laws of the State of New Jersey.

~~JURSIDCTION~~

## JURISDICTION

6. This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against Defendant MUNICIPALITY OF PRINCETON for violations of the Fourth Amendment of the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343, which authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, which authorizes declaratory ~~judgements~~judgments via the Declaratory ~~Judgement~~Judgment Act.

8. Venue is proper in this Court as Defendant conducts ~~their~~its business in the District of New Jersey. Further, the conduct of Defendant giving rise to this Action occurred in the District of New Jersey.

## GENERAL ALLEGATIONS

9. Princeton has a variety of metered and non-metered on-street parking within the limits of its municipal power.

10. Some of the non-metered on-street parking zones are subject to certain time limits under applicable municipal ordinances—i.e. a car is only allowed to park in that zone for a period ~~a~~of time before needing to be reparked or otherwise moved. These zones are codified in § B19-23 of the Princeton Municipal Code.

11. To determine whether a vehicle in a time limited non-metered parking zone has parked in the zone longer than the prescribed time limit, Princeton sometimes places chalk on the tires of vehicles in a time-restricted non-metered zone.

~~12. In the course of his daily life in the Princeton, Freeman has frequently observed that the non-metered parking zones have little to no vehicles and has not observed any safety hazards arising because of vehicles parking in a non-metered parking zone.~~

~~13. Freeman has not observed any emergent issues or substantive amounts of traffic arising from vehicles parking in a non-metered parking zone.~~

~~14. Princeton has not articulated, documented, or implemented any traffic-safety, emergency, or community-caretaking justification for the routine enforcement of non-metered time-limited parking zones through tire chalking.~~

12. ~~Princeton has never~~ Princeton physically marked the Vehicle's tire before determining that the applicable parking time limit had been exceeded. The physical marking occurred independently of whether a citation was subsequently issued or whether Freeman ultimately paid or contested any parking fine.

**Princeton Chalks Freeman's Vehicle**

13. Freeman maintains lawful, exclusive possession and control of a 2019 Mazda 3 vehicle (the "Vehicle"). In August 2019 (while Freeman was in high school), the Vehicle was provided to Freeman by his father, Barry T. Freeman, for Freeman's exclusive use.

a. The gray 2019 Mazda 3 identified as the Vehicle in this Complaint is the same vehicle identified in the November 5, 2024 and February 7, 2025 municipal-court records submitted by Defendant in connection with its Motion to Dismiss the original complaint.

14. The Vehicle has remained registered in Barry T. Freeman's name, but Freeman has continued to exercise exclusive possession and control of the Vehicle, including the authority to operate, park, maintain, and determine who may use it.

15. Barry T. Freeman has never driven, operated, or parked the Vehicle in Princeton, New Jersey. Since Freeman acquired possession of the Vehicle in August 2019, no other person besides Freeman has operated, driven, or parked the Vehicle in Princeton, New Jersey.

a. The Vehicle was obtained directly from a dealership and shipped to Freeman's residence in Summit, New Jersey where the Vehicle was provided to Freeman.

16. Since receiving the Vehicle, Freeman has exercised exclusive possession and control over it, including the sole authority to operate, park, maintain, and determine who may use the Vehicle.

17. Barry T. Freeman has offered on numerous occasions to transfer legal title to the Vehicle to Freeman. Freeman has declined to accept the transfer because of the administrative burdens associated with transferring title and registration, rather than any limitation on his possession, use, or control of the Vehicle. Barry T. Freeman has continued to permit Freeman exclusive possession and control of the Vehicle.

a. Barry T. Freeman has no present intention of changing Freeman's relationship with the Vehicle.

18. Neither Freeman nor Barry T. Freeman has ever consented to the emplacement of chalk by Princeton or any other person on the Vehicle.

15.19. Neither Princeton nor any of its parking enforcement officers has ever obtained a warrant prior to chalking any vehiclethe Vehicle.

16. Since 2020, Princeton has received a substantial sum of money because of their chalking practices. Princeton has a strong financial interest in the use of chalking for revenue generation and general law enforcement purposes.

20. Since 2020,Upon information and belief, on each chalking occasion alleged in this Complaint, neither Princeton nor its parking enforcement officers had individualized suspicion that the Vehicle was parked in violation of any law before chalking it.

21. On the following dates, the Vehicle was chalked by Princeton and a ticket was issued for overtime parking: November 5, 2024, February 7, 2025, and March 17, 2026.

a. On each of the above-identified dates, Freeman personally drove and parked the Vehicle in a non-metered, time-limited parking zone.

b. At the time of each of the chalking incidents, Freeman had lawful and exclusive possession and control of the Vehicle, including the authority to operate, retrieve, move, and exclude others from using it.

c. For each identified chalking incident, Freeman retained exclusive possession and control of the Vehicle throughout the period during which it was parked and chalked by Princeton has.

d. For each identified chalking incident, Princeton's parking enforcement officer physically contacted and marked the Vehicle's tire with chalk to obtain information about whether the Vehicle remained parked in the same location.

e. Princeton subsequently issued a paper parking citation and served such citation on the Vehicle. Freeman, rather than Barry T. Freeman, paid the resulting fine. Barry T. Freeman did not plead guilty to the offense.

i. At no point when paying the fines did Freeman identify Barry T. Freeman as the person who was guilty.

ii. The tickets did not identify Barry T. Freeman.

iii. Freeman himself pled guilty on the NJCourts website.

iv. Freeman submitted the guilty plea through his own NJCourts account that identifies him as the account holder and not Barry T. Freeman. No screen that Freeman viewed identified Barry T. Freeman as the person pleading guilty.

v. In a separate unrelated matter, Freeman paid Ticket No. E23 21662 in person. Freeman was the exclusive operator of the Vehicle under the circumstances which that ticket was incurred. Freeman identified the relevant ticket number, used his credit card, and signed the receipt for his credit card. Freeman was never ~~disciplined~~asked to identify the individual pleading guilty. The paper citation identified no individual defendant, but the municipal court record identifies Barry T. Freeman as the defendant.

vi. Barry T. Freeman never pled guilty to any of the tickets issued in connection with the identified chalking events.

vii. As the operator of the Vehicle for the ticket in question, Freeman was personally liable for the ticket and pled guilty in that capacity. *See* N.J.S.A. 39:4-139.5(a).

f. No contested hearing, trial, or evidentiary proceeding occurred concerning any of the citations. Each citation was resolved through the submission of a guilty plea by Freeman and payment of the assessed fine (by Freeman).

22. The municipal-court records submitted by Princeton concerning the November 5, 2024 and February 7, 2025 citations identify Barry T. Freeman as the defendant. Those citations concern the same Vehicle described above. Freeman acknowledges that identification in the records, but as alleged above he personally operated and parked the Vehicle, maintained lawful and exclusive possession and control of it during the relevant chalking incidents, and personally submitted the payments resolving those citations. Barry T. Freeman did not personally submit those payments or personally communicate a guilty plea concerning those citations.

23. On the following dates, the Vehicle was chalked but no ticket was issued: October 20, 2025, April 28, 2026, April 30, 2026, September 22, 2026, and September 24, 2026.

a. For each identified chalking incident, Freeman personally drove and parked the Vehicle in a non-metered, time-limited parking zone.

b. At the time of each of the identified chalking incidents, Freeman had lawful and exclusive possession and control of the Vehicle, including the authority to operate, retrieve, move, and exclude others from using it.

c. For each of the identified chalking incidents, Freeman retained exclusive possession and control of the Vehicle throughout the period during which it was parked and chalked by Princeton.

d. For each of the identified chalking incidents, Princeton's parking enforcement ~~agent~~officer physically contacted and marked the Vehicle's tire with chalk to obtain information about whether the Vehicle remained parked in the same location.

24. In addition to the specifically identified chalking incidents, Freeman did not inspect the Vehicle's tires following every occasion on which he parked in one of Princeton's non-metered, time-limited parking zones. Accordingly, Freeman cannot presently determine whether Princeton chalked the Vehicle on additional occasions.

25. The full extent of Princeton's chalking of the Vehicle, including the number and dates of any additional incidents, is a factual matter that may be established through discovery, including Princeton's parking enforcement records, and, to the extent genuinely disputed and supported by evidence, determined by a jury.

**Princeton's Chalking is Done Arbitrarily and Capriciously**

26. Princeton's parking enforcement officers exercise discretion in determining which vehicles to chalk in a non-metered, time-limited parking zone.

27. Princeton's officers do not uniformly chalk every vehicle parked within a particular non-metered, time-limited parking zone.

a. On October 20, 2025, the Vehicle was chalked while at least one surrounding vehicle was not chalked by Princeton's parking enforcement officers. This vehicle was in the same non-metered parking zone as the Vehicle.

b. On April 30, 2026, the Vehicle was chalked while several nearby vehicles were not chalked by Princeton's parking enforcement officers. At least one of the cars that was not chalked was present when Freeman originally parked the Vehicle and did not appear to have moved, despite the intervening chalking.

c. On September 10, 2026, Freeman observed that several vehicles had been chalked by Princeton. Every vehicle Freeman observed bearing chalk markings had New Jersey license plates, while several nearby vehicles remained unmarked, all of which displayed out-of-state license plates. These vehicles were all parked within the same non-metered parking zone as the Vehicle.

d. On September 22, 2026, the Vehicle was chalked while several nearby vehicles were not chalked, including a vehicle with multiple police benevolent association stickers on the driver's back window.

e. The car with multiple PBA stickers was present when Freeman originally parked the Vehicle and did not appear to have moved, despite the intervening chalking. This vehicle was parked in the same non-metered parking zone as the Vehicle.

f. On September 24, 2026, the Vehicle was chalked while several nearby vehicles were not chalked, including a vehicle with a "U.S. Department of Homeland Security" sticker on the driver's side back window. This vehicle was parked in the same non-metered chalking zone as the Vehicle.

28. Upon information and belief, Princeton's parking enforcement officers do not chalk vehicles that bear police affiliation and sometimes do not chalk vehicles that have out of state plates.

~~17.~~29. Princeton has no written policy relating ~~the chalking of any vehicle.~~ to how officers chalk vehicles, what vehicles they decide to chalk, or when they decide to chalk.

a. Freeman submitted an Open Public Records Act request pursuant to New Jersey law for "Documents sufficient to identify any policy relating to the practice of

chalking or otherwise emplacing chalk on cars for parking enforcement practices." Princeton stated that "No Records Exist[.]"

18.30. Princeton gives its parking enforcement agents broad discretion as to whether or not chalk any vehicle.to chalk any vehicle. Based on the incidents described above and Princeton's response to the records request described below, upon information and belief, Princeton does not provide its agents with any training to ensure that an agent is not arbitrarily and capriciously chalking a particular vehicle or class of vehicles.

19. Princeton engages in the practice of chalking in an arbitrary and capricious manner and selects certain vehicles for chalking and not others.

20. Princeton has and continues as an on-going policy, custom, or practice in which its employees and agents chalk vehicles as a surveillance tool.

a. Freeman submitted an Open Public Records Act request pursuant to New Jersey law for "Documents sufficient to identify any training parking enforcement officers have received related to the practice of chalking or otherwise emplacing chalk on cars for parking enforcement purposes, including any training relating to Ms. Peg Glassen." Princeton stated that "No Records Exist[.]"

**Princeton Is Liable Under *Monell***

31. Princeton's parking enforcement officers have been engaged in the act of chalking vehicles since at least 2017.

a. Prior to November 2017, Princeton retained an infrastructure consulting firm (Nelson Nygaard) to evaluate its parking strategy.

b. As part of this engagement and as documented in a June 14, 2017 report, Nelson Nygaard undertook a variety of investigative steps into Princeton's parking

strategy, including doing an "EVALUATION OF EXISTING CONDITIONS," a "Background Document Review", and a "Zoning and Regulatory Analysis."

c. The engagement culminated in a presentation to the Princeton Council on January 22, 2018 where Nelson Nygaard produced a final report which spanned over two hundred pages (across various appendixes and supplementary material).

d. In this report, Nelson Nygaard noted that license plate recognition technology could reduce labor costs associated with traditional chalking by providing a form of digital chalking. This information was also in a draft report dated November 2017.

e. Nelson Nygaard included the section on chalking because it had reviewed Princeton's parking enforcement practices and was made aware that chalking was being done.

f. In a January 2022 report, the Princeton Parking Task Force recommended against the use of license plate readers because the technology "risks invasion of privacy and civil liberties issues[.]" The task force acknowledged, as the Nygaard report noted, that license plate recognition technology is a "labor saving tool" and found that it would save Princeton over forty thousand dollars per year to switch.

   i. Upon information and belief, the majority of the cost savings would occur from the reduced man-hours from the traditional chalking that Princeton currently uses.

   ii. This task force report was included in the materials provided to Princeton Council on January 11, 2022. Princeton's Mayor and all Council members were present. The minutes of the meeting explain that there was a presentation by the Princeton Parking Task Force specifically on its

recommendation not to purchase license plate reader technology. Upon information and belief, the Mayor and the Council had knowledge of the contents of the report.

iii. The minutes also note that the recommendations of the Princeton Parking Task Force were "guided by the Nygaard recommendations" and that they shared the reasoning of the task force recommendations.

32. By at least January 22, 2018, Princeton's Mayor and Council knew of Princeton's practice of chalking vehicles as a parking enforcement method.

33. By at least April of 2021, Princeton's Mayor and Council found and declared the use of "marking devices to write graffiti" on "vehicles" to "constitute[] a deleterious practice contrary to the public health and welfare[.]" Princeton Ordinance 2021-11.

34. Upon information and belief, Princeton's Mayor and Council knew that the practice of chalking was ongoing and that it was technically using a marking device on vehicles that could, depending on the definition, constitute graffiti.

35. As a result, when promulgating new graffiti restrictions, Princeton's Mayor and Council specifically exempted from the definition of graffiti "temporary, easily removable chalk markings in connection with any lawful business or public purpose or activity." Princeton Municipal Code B22-4.1(a).

36. Upon information and belief, Princeton's Mayor and Council included this exemption, at least in part, in order to ensure that Princeton's chalking practice was not made unlawful by Princeton's own municipal ordinance.

~~21.~~37. On November 5, 2024, after receiving a ticket from Princeton on that day relating to a purported violation of § B19-23 of the Princeton Municipal Code, Freeman submitted

a discovery request under applicable state law to Christopher Koutsouris (the Princeton municipal attorney). On November 7, 2024, Shannon Lawson (a Princeton employee) sent *inter alia* the following documents (with Mr. Koutsouris carbon copied):

a. A photo taken by Officer ~~Glasson~~Glassen (the parking enforcement officer employed by Princeton) showing that the Vehicle ~~(as defined below)~~ was chalked.

b. A photograph of a page of the log book (the "Log Book") made by Officer ~~Glasson~~Glassen showing the streets on which he had engaged in the practice of emplacing chalk on vehicles and the applicable time.

~~22.~~38. The one page of the Log Book shows that Officer ~~Glasson~~Glassen engaged in the practice of chalking in a routine manner, including on October 17, 2024, October 22, 2024, October 23, 2024, October 30, 2024, and November 5, 2024. On these dates combined, he appeared to have engaged in chalking on seventeen streets.

~~23.~~39. The employees and agents of Princeton were aware of the chalking efforts by Officer Glassen and at least ~~one~~two other parking enforcement ~~agent~~agents (who Freeman has observed chalking vehicles~~). Officer Glassen~~ or observed chalking related tickets being placed on vehicles). The chalking documented in the Log Book was ~~not~~part of a ~~rogue employee nor was this~~recurring enforcement practice undertaken by multiple Princeton parking enforcement officers, rather than an isolated ~~incident~~act of a single employee.

a. Indeed, the Princeton Police Department's 2025 annual report notes that there are four parking enforcement officer positions. Freeman has observed four distinct Princeton parking enforcement officers in 2026.

b. There are four parking enforcement officers in Princeton's employ. As a result, three of Princeton's four parking enforcement officers engage in the practice of chalking.

c. Freeman understands that one parking enforcement officer is assigned to the evening shift. Upon information and belief, the officer whom Freeman has not observed engaging in chalking is assigned to that shift. The time limits in the relevant non-metered parking zones cease to apply at 6:00 p.m., after which chalking is unnecessary to monitor compliance with those time limits.

40. Princeton knows that its parking enforcement officers regularly engage in the practice of chalking and have actively supported these efforts, including .

24.41. Upon information and belief, the chalk used by purchasing Princeton's parking enforcement officers is purchased by Princeton and Princeton has additionally issued parking enforcement officers various chalking sticks, notepads, and other chalking related paraphernalia.

**Freeman Parks Routinely in Chalking Zones**

a. -Freeman has observed that all chalking of vehicles by Princeton appears to use the same chalk.

b. Freeman has observed at least three Princeton parking enforcement officials on dozens of occasions across three years and they all appear to have standardized uniforms, parking kits, notepads, and other parking enforcement gear.

c. Freeman's observations of the three Princeton parking enforcement officers engaging in chalking have shown that they appear to chalk using the same chalking sticks.

42. Under Sections B2-5.3 and T7-9 of the Princeton Municipal Code, all payments by Princeton, including payments for chalk and other chalking related items, must be signed for by the Mayor of Princeton.

43. Upon information and belief, for each purchase of chalk or chalking related items, the Mayor of Princeton knew that Princeton was purchasing chalk or chalking related items and signed for the purchase.

44. Under Sections B2-5.3 and T7-5 of the Princeton Municipal Code, Princeton's Council is required to approve any expense incurred by Princeton, including expenses for chalk or chalking related paraphernalia.

45. Upon information and belief, for each purchase of chalk or chalking related items, the Council of Princeton knew that Princeton was purchasing chalk or chalking related items and consented to the purchase.

46. On September 10, 2026, an unidentified female Princeton parking enforcement officer told Plaintiff that "we" chalk vehicles because of the two hour parking restriction. Upon information and belief, the term "we" describes Princeton.

47. On March 2, 2026, Freeman commenced this Action against Princeton, expressly challenging its practice of physically marking vehicle tires with chalk as a violation of the Fourth Amendment to the United States Constitution. *See* ECF No. 1. That same day, Freeman served Princeton with a copy of the original Complaint in this Action. *See* ECF No. 5.

48. Notwithstanding the commencement of this Action, Princeton continues to employ tire chalking as a parking enforcement method. In particular, after commencement of this Action, Princeton's parking enforcement officers chalked vehicles on at least the following

dates: March 2, 2026 (the date of the complaint), March 17, 2026, March 20, 2026, April 28, 2026, April 30, 2026, August 6, 2026, August 20, 2026, August 24, 2026, September 10, 2026, September 22, 2026, September 24, 2026, and October 27, 2026.

49. Princeton did not discontinue the challenged practice following notice of Freeman's constitutional objections. Instead, its officers continued physically marking the Vehicle's tires in the same manner challenged in this Action.

    a. Indeed, Princeton has expressly defended its chalking practice in motion practice before this Court. Princeton, through its counsel, argued: "A straightforward application of the reasonableness standard compels the conclusion that Princeton's tire chalking practice does not violate the Fourth Amendment." ECF No. 18 at 15. Princeton further asserted: "The chalk mark is the minimum necessary intrusion to accomplish the regulatory purpose." ECF No. 9-1 at 26.

50. Princeton's continued implementation of tire chalking following notice of this Action further demonstrates the longstanding and ongoing nature of its municipal chalking practice.

51. Princeton's repeated and documented use of tire chalking across multiple streets, dates, and parking enforcement officers constitutes a longstanding, widespread, and well-settled municipal custom of physically marking vehicle tires to enforce parking restrictions.

52. Princeton's parking enforcement officers chalked the Vehicle pursuant to this established municipal custom, which was the moving force behind the physical intrusions challenged in this Action.

53. Princeton's parking enforcement officers chalked the Vehicle pursuant to a municipal policy, which was the moving force behind the physical intrusions challenged in this Action.

a. This policy includes the purchasing and furnishing of chalk to Princeton's parking enforcement officers and allowing parking enforcement officers to chalk vehicles.

**Future Harm Allegations**

25.54. Freeman routinely drives and parks a gray Mazda sedan (the "Vehicle") while in the limits of within Princeton, New Jersey.

26. Freeman has never given consent to Princeton to chalk the Vehicle nor has any other person given consent to Princeton to chalk or otherwise touch the Vehicle.

27. The Vehicle was physically contacted and marked by municipal agents without consent on multiple occasions, resulting in physical residue on the tire and wheel which acted as a surveillance tool on Freeman's movements.

28.55. Freeman regularly commutes from his apartment on the premises of Princeton University to his office at SherrardSherrerd Hall (on the campus of Princeton University).

a. Freeman is a Ph.D. candidate at Princeton University and regularly goes to Sherrerd Hall (and his office) for a variety of purposes, including but not limited to: meeting with his advisor, conducting office hours, attending seminars and colloquia, working on his research, and attending classes.

29.56. Because Freeman cannot park in the Princeton University parking lots nearest to his office, Freeman parks in the nearby non-metered time-limited parking spots.

57. During a typical Monday-through-Friday workweek, Freeman ~~routinely~~drives and parks the Vehicle in these non-metered, time-limited ~~non-metered zones within~~parking spaces on approximately four separate workdays, at times between 9:00 am and 4:00 pm.

    a. This routine has been in place since around September of 2024.

58. Freeman intends to continue driving and parking the Vehicle in these zones as part of his regular academic activities. Princeton ~~and faces a credible and ongoing threat that the Vehicle will again be~~has repeatedly chalked ~~pursuant to~~ the Vehicle in such zones, including on multiple occasions after commencement of this Action. In light of Princeton's continuing ~~policies and~~ practice and Freeman's regular parking activities, Freeman faces a substantial risk of future chalking absent judicial intervention.

~~30.~~59. Freeman has no present intention of discontinuing his regular use of these parking zones or changing his parking practices to avoid Princeton's tire-chalking enforcement.

~~31. Freeman has on many times observed parking enforcement agents engaging in the practice of chalking.~~

    a. ~~Freeman has observed the Vehicle chalked by~~ Freeman presently intends to continue regularly driving and parking the Vehicle, or another vehicle in his lawful and exclusive possession and control, in the parking zones described above as part of his regular academic activities.

~~32.~~ Princeton ~~while nearby~~repeatedly chalks vehicles ~~were not chalked. Specifically, on October 20, 2025, Freeman observed the Vehicle had been chalked but at least one vehicle in the surrounding area was not chalked. This occurred in a non-metered time limited parking zone.~~

33. Freeman observed in the Vehicle chalkedareas around Sherrerd Hall where Freeman parks. All of the identified chalkings of the Vehicle, except for the incident arising on two other instances:

    a. On November 5, 2024, the Vehicle was chalked by Princeton and a ticket was issued for a purported violation of § B19-23 of the Princeton Municipal Code.

    b. On February 7, 2025, the Vehicle was chalked by Princeton while parking in a non-metered time limited parking zone.

34. The Vehicle has been chalked several times beyond the three times directly observed by Freeman.

35. In all instances, Princeton never obtained a search warrant prior to emplacing chalk upon the Vehicle.

36. In all instances, Princeton had no probable cause or individualized suspicion of wrongdoing by the Vehicle prior to emplacing chalk on the vehicle.

37. In all instances, the determination to chalk the Vehicle was at the parking enforcement officer's complete discretion.

**Chalking is a Suspicionless Search**

38. In 2012, the United States Supreme Court pronounced in *U.S. v. Jones* that the government "physically occupied private property for the purpose of obtaining information" when it "trespassorily inserted the information-gathering device" onto a vehicle. This physical intrusion, the Supreme Court ruled, violated the Fourth Amendment when performed without a warrant.

39. By engaging in chalking, the Princeton "usurped" Freeman's "property for the purpose of conducting surveillance on him," which is "undoubtedly entitled to, Fourth Amendment

protection." *United States*arose *v. Jones*, 565 U.S. 400, 413, 132 S. Ct. 945, 954, 181 L. Ed. 2d 911 (2012) (Sotomayor, J. concurring)

40. The decision of *U.S. v. Jones* provides the contours of a federally-protected right that is sufficiently clear so that every reasonable official, including Defendant MUNICIPALITY OF PRINCETON, would have understood that right as being established, at the latest, in 2012 and long before any tickets in dispute in this case were issued.

41. The present case involves governmental actors engaging in more than naked-eye surveillance of private property.

42. The present case involves governmental actors acting without individualized suspicion.

43. Princeton continues to maintain and enforce a policy, custom, or practice of chalking vehicle tires in time-limited non-metered parking zones.

44. Freeman continues to park in such zones as part of his daily routine and will be subject to future chalking absent judicial intervention.

**Chalking Does Not Fall into Any Fourth Amendment Exceptions**

45. In *City of Indianapolis v. Edmond*, the Supreme Court made clear that a "search or seizure is ordinarily unreasonable in absence of individualized suspicion of wrongdoing." 531 U.S. 32, 37 (2000). The Supreme Court also made clear that it has "recognized only limited circumstances in which the usual rule" of individualized suspicion "does not apply."

46. In *Delaware v. Prouse*, the Supreme Court made clear that individualized suspicion is required when officers have "standardless and unconstrained discretion[.]" 440 U.S. 648, 661 (1979). The Supreme Court also made clear that when the "government's motivation is to investigate … breaches of [] statutory or regulatory standards", the applicable "inspections unaccompanied by any quantum of individualized, articulable suspicion must

~~be undertaken pursuant" to the "neutral criteria" specified in *Marshall v. Barlow's, Inc. Id.* at 662.~~

~~47.~~60. ~~The decisions of *City of Indianapolis v. Edmond, Delaware v. Prouse,* and *Marshall v. Barlow's, Inc.* provides the contours of a federally-protected right that is sufficiently clear so that every reasonable official and agency, including Defendant MUNICIPALITY OF PRINCETON, would have understood that right as being established, at the latest, in 2000 and long before any tickets in dispute~~ in this ~~case were issued~~specific area.

**COUNT I**
**FOURTH AMENDMENT VIOLATION**
**(42 U.S.C. § 1983)**

~~48.~~61. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

~~49.~~62. The present case involves governmental actors engaging in more than naked-eye surveillance of private property.

~~50.~~63. The surreptitious placement of chalk marks on private vehicles (without a valid warrant, consent of the owners, or ~~exigent circumstances~~other exception to the Fourth Amendment) undertaken to physically place a device on private property to gather information ~~as well as conducting~~and conduct non-overt surveillance on the movement or non-movements of vehicles violates the Fourth Amendment to the United States Constitution.

64. Princeton, acting through its parking enforcement officers, has repeatedly physically marked the Vehicle's tires to obtain information about whether the Vehicle has moved. These physical intrusions occurred while Freeman maintained lawful, exclusive possession and control of the Vehicle, without a warrant, consent, or an applicable exception to the

warrant requirement. These intrusions constitute unreasonable searches in violation of his Fourth Amendment possessory interests.

~~51.~~65. The placement of chalk-like marks on private vehicles (without a valid warrant, consent of the owners, or ~~exigent circumstances~~other exception to the Fourth Amendment) undertaken to physically place an apparatus on private property to gather information ~~as well as conducting~~and conduct surveillance on the movement or non-movements of vehicles is a policy, custom, and/or practice of Defendant MUNICIPALITY OF PRINCETON sufficient to impose damages and other relief pursuant to *Monell v. New York City Department of Social Services* and its progeny.

~~52.~~66. Plaintiff JAKE FREEMAN has experienced constitutional ~~and monetary~~ harm by the unconstitutional processes and procedures undertaken by a policy, custom, and/or practice of the Defendant.

~~The conduct of Princeton was reckless and undertaken with complete indifference to~~ **COUNT II**

**FOURTH AMENDMENT VIOLATION**

**(Nonstatutory Action in Equity, Pleaded in the Alternative)**

67. Plaintiff ~~JAKE FREEMAN's right~~repeats and realleges all preceding paragraphs as if fully set forth herein.

68. Freeman brings this Count independently of 42 U.S.C. § 1983 and in the alternative to the statutory claim asserted in Count I. Freeman seeks prospective declaratory and injunctive relief to ~~be free from~~ prevent continuing and threatened violations of his rights under the Fourth Amendment ~~to the United~~(which is incorporated against the States and Princeton under the Fourteenth Amendment). This Court still has jurisdiction under 28 U.S.C. § 1331.

69. Freeman invokes the federal courts' traditional equitable authority to restrain unconstitutional governmental action. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*,

575 U.S. 320, 326–27 (2015); *Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 434 (5th Cir. 2023); *Green Valley Special Util. Dist. v.* ~~Constitution~~*City of Schertz, Texas*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc).

70. Princeton, acting through its parking enforcement officers, has repeatedly physically marked the Vehicle's tires to obtain information about whether the Vehicle has moved. These physical intrusions occurred while Freeman maintained lawful, exclusive possession and control of the Vehicle, without a warrant, consent, or an applicable exception to the warrant requirement. These intrusions constitute unreasonable searches in violation of his Fourth Amendment possessory interests.

71. Princeton continues to employ tire chalking in the non-metered, time-limited parking zones Freeman regularly uses. Its officers have repeatedly chalked the Vehicle, including after the commencement of this Action. Freeman regularly parks the Vehicle in those zones in connection with his academic activities and intends to continue doing so. Princeton's continuing enforcement practice and Freeman's recurring use of those zones subject him to a real and immediate threat of additional unconstitutional searches.

72. Freeman lacks an adequate remedy at law for the threatened repetition of these physical intrusions. Damages for completed chalkings would not prevent additional searches. Without prospective relief, Freeman faces recurring intrusions upon the Vehicle while it remains in his lawful and exclusive possession.

73. The balance of equities and the public interest favor relief protecting Freeman against the challenged searches while permitting Princeton to enforce its parking restrictions through constitutionally permissible means.

53.74. Under this Count, Freeman requests a declaration that the challenged warrantless, nonconsensual tire chalking of the Vehicle (or any other vehicle in which he subsequently holds a possessory interest protected by the Fourth Amendment) violates his Fourth Amendment rights, and a permanent injunction prohibiting Princeton, acting through its officers, agents, and employees, from physically marking the Vehicle's tires (or the tires of any subsequent vehicle as described above) to obtain information for parking time-limit enforcement without a warrant, valid consent, or an otherwise applicable Fourth Amendment exception. Freeman seeks no nominal damages under this Count.

**RELIEF REQUESTED**

54.75. WHEREFORE, Plaintiff JAKE FREEMAN respectfully requests this Court to:

a. Enter an order, pursuant to the Declaratory JudgementJudgment Act, declaring the policies, customs, and practices of Princeton to emplace chalk upon a vehicle as being unconstitutional;

b. Enter an order for injunctive relief to halt the illegal processes and procedures of the Defendant in violation of the Fourth Amendment to the United States Constitution;

c. Enter an award of nominal damages in favor of Plaintiff; (under Count I);

d. Enter an order disgorging the Defendant of any monies obtained as result of their unconstitutional and illegal conduct;

e.d. Enter an order for an award of actual reasonable attorney fees and litigation expenses pursuant torecoverable by law and, if counsel is retained in the future, reasonable attorney's fees for that counsel's work to the extent recoverable under

42 U.S.C. § 1988 and all other applicable laws, rules, or statutes; (no attorney's fees are sought for Freeman's time as a *pro se* litigant); and

f.e. Enter an order for all such other relief the court deems equitable.

**JURY DEMAND**

55.76. For all triable issues, a jury is hereby demanded.

Respectfully Submitted

Dated: MarchNovember 2, 2026

By: ________________

Jake Freeman *pro se*